# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

JAMES EDWARD CARVER,

      Petitioner,  :    Case No. 1:24-cv-72

  - vs -          District Judge Susan J. Dlott
               Magistrate Judge Michael R. Merz

WARDEN, Mansfield Correctional
 Institution[1],

             :
      Respondent.

---

# REPORT AND RECOMMENDATIONS

---

   This is a habeas corpus action brought *pro se* by Petitioner James Carver under 28 U.S.C. 2254 to obtain relief from his convictions in the Highland County Court of Common Pleas for murder, rape, having weapons under disability, and tampering with evidence (Petition, ECF No. 3, PageID 60). It is ripe for decision on the Petition, the State Court Record (ECF No. 8), the Return of Writ (ECF No. 9), and Petitioner's Traverse to the Return (ECF No. 17).

   The Magistrate Judge reference in the case was recently transferred to the undersigned to help balance the Magistrate Judge workload in the District (ECF No. 20).

---

[1] Petitioner has filed a change of address to the Mansfield Correctional Institution (ECF No. 19). Acting *sua sponte* and pursuant to Fed.R.Civ.P. 25, the Respondent in this case is changed to the Warden at Mansfield Correctional Institution and the caption modified as set forth above.

**Litigation History**

On April 2, 2019, Carver was indicted by a Highland County grand jury and charged with murder with a firearm specification, rape, having weapons while under a disability, domestic violence, and tampering with evidence (Indictment, State Court Record, ECF No. 8, Ex. 1). A trial jury found Carver guilty of murder, rape, having weapons under disability, assault (as a lesser included offense of domestic violence), and tampering with evidence. *Id.* at Ex. 9. Carver was sentenced to imprisonment for thirty-three years to life. *Id.* at Ex. 10.

Carver appealed to the Ohio Court of Appeals for the Fourth District which affirmed the convictions. *State v. Carver,* 2020-Ohio-4984 (4th Dist. Oct. 13, 2020)(copy at State Court Record ECF No. 8 at Ex. 15). Carver appealed *pro se* to the Ohio Supreme Court, but that court declined to exercise jurisdiction. *Id.* Ex. 21. On July 10, 2020, Carver filed a motion for new trial which was denied. *Id.* at Exs. 22, 24. On July 20, 2020, he filed a petition for post-conviction relief under Ohio Revised Code § 2953.21. *Id.* at Ex. 27. The Common Pleas Court denied the Petition (*Id.* at Ex. 30) and Carver again appealed to the Fourth District which affirmed. *Id.* at Ex. 35. That court again affirmed (*Id.* at Ex. 35) and Carver did not appeal to the Ohio Supreme Court.

Carver requested and was granted leave to file an application to reopen his direct appeal under Ohio R. App. P. 26(B). *Id.* at Exs. 36, 37. The Fourth District granted reopening on one issue, but eventually found there had been no ineffective assistance of appellate counsel. *Id.* at Ex. 44. The Ohio Supreme Court declined jurisdiction of a further appeal. *Id.* at Ex. 47.

Carver filed his Petition in this Court on February 2, 2024, by depositing it in the mail on that date (Petition, ECF No. 3, PageID 73). He pleads the following Grounds for Relief:

> **Ground One**: Trial Court erred by allowing interview to be played without redacting discussion on sex.

**Supporting Facts**: There was absolutely no evidence outside of my interview with the Detective to give reason, first off for rape charge. And to allow my interview to be used, and my interview was mistaken, and I was under great stress, had [not clear] just attempted suicide.

**Ground Two**: Insufficient Evidence to Verdict on Murder and Rape

**Supporting Facts:** I had the victim took to the hospital, Detective admitted on the stand that they didn't DNA the gun [?] being [?] he knew both mine and victims DNA would be present due to the struggle over the gun, which caused the gun to go off, Judge adds reckless homicide to jury instruction, saying I was probably going to be acquitted of murder. And knowledge in record the gun going off was accidental. Has [?] for the rape, DNA excluded me from touch an any other sexual conduct or contact (sic).

**Ground Three**: Ineffective appellant [sic] counsel, failing to raise several errors. Erroneous Jury Inst.

**Supporting Facts**: Failure to raise ineffective trial counsel, for not objecting to erroneous jury instructions, instructions misstated the essential element for murder – which is "purposely" instead the Jurors was told they convict if I "knowingly" caused the death of – of course. They would convict on knowingly, that wasn't in doubt. I do not feel they would of convicted, had the proper instruction been given.

**Ground Four**: Ineffective trial counsel, failure to object to erroneous Jury Instructions, invest, present before (sic).

**Supporting Facts:** I only spoke with my Trial lawyer twice. He did nothing to present my defense, contacted no witness – his failure to object to Jury Instructions, made it impossible to get any verdict besides guilty. The Jurors Instructions didn't once properly define Ohio R.C. 2903.02(A) or the essential elements, replacing purposely with a much lesser mental state knowingly.

Petition, ECF No. 3, PageID 64-69.

# Analysis

### Ground One:  Error in Admitting Unredacted Tape of Interview

In his First Ground for Relief, Carver argues the trial court committed error in allowing the jury to hear the full recording of his interview with Detective Antinore without redacting it to eliminate portions discussing his having sex with the victim, Heather Camp, after he shot her.  He argued in his First Assignment of Error on direct appeal that this was a violation of the corpus delicti rule of evidence.  The Fourth District rejected that claim in a lengthy portion of its opinion *State v. Carver, supra,* at ¶¶ 50-75.

Respondent argues that Ground One is not cognizable in habeas corpus (Return, ECF No. 9, PageID 1892).  Federal habeas corpus is available only to correct federal constitutional violations.  28 U.S.C. § 2254(a); *Wilson v. Corcoran,* 562 U.S. 1 (2010)*; Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982), *Barclay v. Florida,* 463 U.S. 939 (1983).  "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); see also *Elmendorf v. Taylor*, 23 U.S. (10 Wheat.) 152, 160 (1825)(Marshall C. J.); *Bickham v. Winn*, 888 F.3d 248 (6th Cir. Apr. 23, 2018)(Thapar, J. concurring).

A habeas corpus court does not sit to correct errors in the application of state evidence law.

> With regard to evidentiary rulings, the standard for habeas relief is not easily met. "[F]ederal habeas courts review state court evidentiary decisions only for consistency with due process."

> *Coleman v. Mitchell,* 268 F.3d 417, 439 (6th Cir. 2001). "A state court evidentiary ruling will be reviewed by a federal habeas court only if it were so fundamentally unfair as to violate the petitioner's due process rights." *Coleman v. Mitchell,* 244 F.3d 533, 542 (6th Cir. 2001). Moreover, such rulings "are usually not to be questioned in a federal habeas corpus proceeding." *Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988)). Even if errors are made in the application of state law, "[such] errors . . . especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir.), cert. denied, 464 U.S. 962, 104 S. Ct. 396, 78 L. Ed. 2d 338 (1983). If a ruling is especially egregious and "results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003) (citing *Coleman*, 244 F.3d at 542). Importantly, however, as a general matter, "state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour*, 224 F.3d at 552 (quoting *Montana v. Egelhoff,* 518 U.S. 37, 43, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996)). Ultimately, states have wide latitude with regard to evidentiary matters under the Due Process Clause. *Id*.

*Wilson v. Sheldon,* 874 F.3d 470, 475-76 (6th Cir. 2017).

Petitioner has cited no decision of the United States Supreme Court holding that adherence to the corpus delicti rule or any particular formulation of that rule is required by the United States Constitution. Therefore Ground One should be dismissed without prejudice as not cognizable in habeas corpus.

**Ground Two: Insufficient Evidence of Murder and Rape**

In his Second Ground for Relief, Carver asserts there was insufficient evidence to convict him of murder or rape. An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States

Constitution. *Jackson v. Virginia,* 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970);

*Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders*, 894 F.2d 792, 794 (6th

Cir. 1990)(en banc). In order for a conviction to be constitutionally sound, every element of the

crime must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the
> light most favorable to the prosecution, any rational trier of fact
> could have found the essential elements of the crime beyond a
> reasonable doubt . . . . This familiar standard gives full play to the
> responsibility of the trier of fact fairly to resolve conflicts in the
> testimony, to weigh the evidence and to draw reasonable inferences
> from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. at 319; *Smith v. Nagy*, 962 F.3d 192, 205 (6th Cir. 2020) (quoting

*Jackson*). This standard "must be applied with explicit reference to the substantive elements of the

criminal offense as defined by state law." *Id.* (quoting *Jackson*, 443 U.S. at 324).

Insufficiency of the evidence was Carver's Second Assignment of Error on direct appeal.

The Twelfth District that Assignment as follows:

> ¶76} " 'A claim of insufficient evidence invokes a due process
> concern and raises the question of whether the evidence is legally
> sufficient to support the verdict as a matter of law.' " *Whiting, supra,*
> at ¶ 36, quoting *State v. Blanton,* 2018-Ohio-1278, 110 N.E.3d 1, ¶
> 12 (4th Dist.), citing *State v. Wickersham,* 4th Dist. Meigs No.
> 13CA10, 2015-Ohio-2756, 2015 WL 4113316, ¶ 22; *State v.
> Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "When
> reviewing the sufficiency of the evidence, our inquiry focuses
> primarily upon the adequacy of the evidence; that is, whether the
> evidence, if believed, reasonably could support a finding of guilt
> beyond a reasonable doubt." *Blanton at* ¶ 12, citing *Thompkins* at
> syllabus. "The standard of review is whether, after viewing the
> probative evidence and inferences reasonably drawn therefrom in
> the light most favorable to the prosecution, any rational trier of fact
> could have found all the essential elements of the offense beyond a
> reasonable doubt." *Blanton* at ¶ 12; citing *Jackson v. Virginia,* 443
> U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Jenks,*
> 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). "Furthermore, a
> reviewing court is not to assess 'whether the state's evidence is to be
> believed, but whether, if believed, the evidence against a defendant

6

would support a conviction.' " *Blanton* at ¶ 12, quoting *Thompkins, supra,* at 390, 678 N.E.2d 541.

{¶77} This test raises a question of law and does not allow us to weigh the evidence. *See Whiting,* at ¶ 37; *State v. Martin,* 20 Ohio App.3d 172, 174, 485 N.E.2d 717 (1983). Rather, the test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson* at 319, 99 S.Ct. 2781. We reserve the issues of the weight given to the evidence and the credibility of witnesses for the trier of fact. *See State v. Thomas,* 70 Ohio St.2d 79, 79–80, 434 N.E.2d 1356 (1982); *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus (1986).

{¶78} For ease of analysis, we begin with Appellant's challenge of his murder conviction. He asserts that the evidence was insufficient to support proof of murder beyond a reasonable doubt and instead supports a conviction for reckless homicide. For the reasons which follow, we disagree.

## 1. Murder

{¶79} Appellant was convicted of murder, R.C. 2903.02(A), which states: "No person shall purposely cause the death of another * * *." A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature. R.C. 2901.22 (A). Appellant concedes responsibility for causing Heather Camp's death; however, he argues the State had insufficient evidence that Appellant *intended* for her to be shot. Appellant urges us to conclude that the physical evidence, as well as his interview, supports a finding of reckless homicide instead of murder.

{¶80} Appellant admits that it was reckless to get the gun out of the holster; reckless to point the gun at anyone; reckless to either turn the safety off or be in such a position that the safety could come off; and reckless to hold the gun in a way that the trigger could be pulled. However, Appellant argues the evidence shows he was the person who told them where the gun could be recovered. He also argues that the very serious crime of reckless homicide motivated his evasive actions. Additionally, he asserts that taking her out in public and asking for help are not congruent with having intentionally harmed her. In fact, Appellant argues his behavior is consistent with

7

someone who actually cared about Heather Camp and also realized he was in serious trouble.

{¶81} We are not persuaded. We have reviewed Appellant's video-recorded interview with Detective Antinore which the jury saw at trial. First of all, it is a mischaracterization to indicate that Appellant was completely forthcoming with the circumstances surrounding the gun. While he eventually told officers that he obtained the gun from Roy Dunihue, he first told officers that the gun was stolen from his house and actually in Heather's bag. Then, three times he told officers that the gun was thrown out of the car onto the side of the road after the shooting. Not until the very end does Appellant inform the officers that he returned it to Dunihue's truck.

{¶82} We are likewise not convinced that Appellant taking Heather through the Frisch's drive-thru and later to the Kinnisons' house is indicative of his concern for her. In the interview, Appellant admits that it is dark and Heather didn't eat anything. There's no evidence he asked anyone at Frisch's to help Heather. Additionally, the evidence demonstrated he also drove her to Burger King, bypassing a hospital facility where he could have sought help between the two restaurants.

{¶83} In the interview Appellant relates going back to his camper after the shooting. When he decided they should leave the camper, Appellant told officers that he pulled his car up to the back of the camper and had Heather come out that way so his neighbors Amy and Todd would not see her. We cannot agree that these actions demonstrated concern for Heather. Rather, these actions tend to demonstrate Appellant's concern for himself and concealing his crime.

{¶84} Further, Appellant's statements to the officers that he insisted Heather go to the hospital but she didn't want to because she had warrants are easily construed as self-serving. These statements are obviously contrary to the testimonies of Mandy Jo Knisley, Bobby Kinnison, and Kalie Kinnison, who each testified that Heather stated at least once that she wanted to live. In particular, it appears that Mandy Jo Knisley was so insistent that Heather be taken for treatment that Appellant concocted the scene in which he and Bobby take Heather downstairs to the garage as if they were taking her to the hospital, but then bring her back upstairs after Mandy leaves. Importantly, Bobby Kinnison also testified that in the garage, Appellant slapped Heather's face, already obviously beaten, and told her to, "Straighten up, bitch." Ostensibly, Appellant was

8

admonishing Heather to "straighten up," and not indicate to anyone again that she wanted to live.

{¶85} As one can see, the evidence in this case demonstrates the volatile nature of Appellant and Heather Camp's relationship. There is evidence of physical abuse and substance abuse. The evidence also suggests that jealousy was a possible motive for shooting Heather.

{¶86} The evidence indicates that Appellant had dinner plans with Heather Camp on Sunday, February 17, 2019. Roy Dunihue testified that sometime on that date, Appellant texted him and asked to borrow a gun. After drinking with Heather and arguing, Appellant went to Dunihue's place with Heather in the vehicle to pick up the gun. Dunihue testified he gave Appellant the gun in a holster with the safety on. According to one version provided by Appellant, Heather was shot shortly after he received the gun from Dunihue, while they were still sitting in Dunihue's driveway.

{¶87} During Appellant's emotional interview, he mentioned Mike Scholler several times. In the first few moments of the interview, he stated that, "She was driving the Trailblazer. [They] got into it over Mike Scholler. I grabbed the gun and it went off." He also indicates that Mike Scholler is in Hamilton, Ohio. Appellant repeatedly explains they argued over Mike Scholler, but at times indicates Heather grabbed the gun. He even tells Detective Antinore that Heather said she'd "set Mike up for him."

{¶88} Towards the end of the interview, Appellant seems to describe the overall toxic nature of his relationship with Heather. He states: "She's on the run ... I'm selling dope. We've got no one to lean on but each other. We always fuck it up." Facts tending to suggest Appellant's jealousy with regard to Heather are scattered throughout his interview.

{¶89} Earlier in the interview, Appellant stated there was "only one person I had a problem with her seeing - Tyler." Appellant stated that when he picked [Heather] up, he "didn't want to hear about the past." Appellant told Detective Antinore he took her to her sister's house to pick up her "stuff." While Heather is inside and Appellant is outside waiting for her, her "ex-boyfriend pulls up" and "come in." "She's inside 20-30 minutes." Appellant got mad and left. He texts her and she replies, "Why are you being an asshole?"

{¶90} At the end of the interview, Appellant relates that they were arguing and he told her to "get off him." He pointed the gun at her

9

and she kicked him. Appellant stated, "I didn't want to argue with her." Then he provides information that he has not previously provided in the first part of the interview. Appellant told Detective Antinore: "I was mad, I put money up for bail. I wanted to get a hotel room. She said she was busy. Always something stupid between us."

{¶91} While during the interview Appellant maintained that he didn't intend to shoot Heather and that he only pointed the gun to scare her, we believe the jury could reasonably infer that Appellant shot Heather out of jealousy. The evidence provided in the interview indicates that Heather had ongoing relationships with "Tyler,"[8] an "ex-boyfriend," and Mike Scholler, which caused Appellant to be upset. They argued at dinner and Mike Scholler came up. According to Appellant, Heather told him she saw Mike Scholler at Wal-Mart earlier. Appellant may not have actually planned for days or weeks to shoot Heather Camp, but he did make arrangements to obtain a gun on a day he argued with her. Appellant pointed a gun at her with the safety off – a gun that was given to him holstered with the safety on, according to Dunihue's testimony. A jury could certainly reasonably infer that Appellant purposely pulled the trigger with the intention of killing her.

{¶92} Our conclusion that Appellant's actions were purposeful is bolstered by evidence of jail phone calls made while Appellant awaited trial. Detective Antinore testified Appellant made approximately 7000 calls from the Highland County jail. Detective Antinore regularly reviews the phone calls made from the jail. He reviewed a call log which demonstrated that on March 30, 2019, Appellant made a phone call during which he told the other speaker that he "knew the safety was off the gun."

{¶93} Additionally, Roy Dunihue testified he handed Appellant the gun in a holster with the safety on. Andrew McClelland, the BCI expert who tested the gun testified that in order to fire the firearm, the safety must be disengaged. In his interview with Detective Antinore, Appellant explained at least twice that the shooting occurred as soon as he brought the gun into the vehicle. We think it may then be reasonably inferred that Appellant purposely removed the gun from the holster and removed the safety mechanism with the intention of firing the gun.

{¶94} Detective Antinore's testimony regarding jail phone calls also belies Appellant's self-serving statements in his interview and on appeal that he was trying to help her. In a June 6, 2019 jail phone call, Appellant discussed Heather's outstanding warrants. Detective

10

Antinore testified: "James tells the other individual that he's talking to, that when he met with Heather Camp at El Dorado's Restaurant in Wilmington, her intention was to turn herself in on the warrants that she had." This directly undermines Appellant's interview statements in which he stated that it was Heather who did not want to seek medical treatment for fear of being taken to jail.

{¶95} Detective Antinore further testified, "[Appellant] observed a plastic bag with loose leaf tobacco that she intended to take into the jail with her when she turned herself in." Detective Antinore further identified a State's exhibit tote bag taken from Appellant's camper with the bloody bra and shirt. Inside the tote bag was also a clear plastic bag containing loose leaf tobacco, as described in the phone call.

{¶96} " 'When a court reviews the record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." ' " *State v. Bennington,* 4th Dist. Adams, 2019-Ohio-4386, 148 N.E.3d 1, at ¶ 11, quoting *State v. Maxwell,* 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; following *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "The court must defer to the trier of fact on questions of credibility and the weight assigned to the evidence." *State v. Dillard,* 4th Dist. Meigs No. 13CA9, 2014-Ohio-4974, 2014 WL 5800342, ¶ 22, citing *State v. Kirkland,* 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132; *State v. Lodwick,* 2018-Ohio-3710, 118 N.E.3d 948, ¶ 9 (4th Dist.). In this case, the trial court gave standard Ohio jury instructions on reasonable doubt, credibility of witnesses, direct evidence, circumstantial evidence, and inferences to be made. Specifically, the trial court instructed:

> To infer, or to make an inference, is to reach a reasonable conclusion, or deduction of facts, which you may, but are not required to make, from other facts which you have found to have been established by direct evidence. Whether an inference is made rests entirely with you.

{¶97} In this case, we defer to the jury who heard the testimony of the witnesses and also viewed Appellant's video interview. We find there was sufficient evidence from which a rational person could find evidence of Appellant's intent to shoot Heather Camp beyond a reasonable doubt. Thus, we find no merit to this argument contained within the second assignment of error.

**2. Rape**

{¶98} Appellant argues that the State failed to prove beyond a reasonable doubt that Appellant committed rape. The elements of rape, R.C. 2907.02(A)(1)(c), are set forth fully above at paragraph #57. Appellant challenges the sufficiency of the evidence on the element of "substantial impairment," asserting that the jury did not have sufficient evidence to conclude that Heather Camp was substantially impaired and therefore unable to give consent to sexual conduct. In our analysis of the first assignment of error, we considered whether there was some evidence tending to prove the material element of substantial impairment in order to properly admit Appellant's confession to having had consensual sex with Heather Camp.

{¶99} The corpus delicti rule is an evidentiary ruling, *State v. Ashe*, 2nd Dist. Montgomery No. 26528, 2016-Ohio-136, 2016 WL 197123, at ¶ 9, and is satisfied by "a rather low" evidentiary standard. *State v. Blevins*, 2nd Dist. Montgomery No. 24006, 2011-Ohio-381, 2011 WL 322651, at ¶ 27, citing *State v. Barker*, Montgomery, 191 Ohio App.3d 293, 2010-Ohio-5744, 945 N.E.2d 1107, ¶ 10. However, here a different standard is required. Here we must determine whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt.

{¶100} In arguing for a rape conviction, the State pointed out that Appellant shot Heather Camp in the center of the chest and, according to Appellant, returned to his camper in Highland County later and had sex with her. The State pointed to the nipple swabs which indicated Appellant's DNA on both nipples. In closing, the State also pointed to Dr. Casto's testimony. The State argued: Her mental state was such that this man had shot her in the chest.

> At that point you can draw the inference, rely on the circumstantial evidence, that [Heather] was in no physical or mental state to consent or resist the defendant having sexual intercourse with her. And the Defendant knew or should have known that the condition existed, because he caused the condition. In order to prove that the defendant had reasonable cause to believe that Heather's ability to resist or consent was substantially impaired because of a physical or mental condition, you must compare him to an ordinary person. Would an ordinary person who had just shot Heather in the chest believe that Heather's ability to resist or consent was substantially impaired?

12

{¶101} As indicated above, we have not found other rape cases containing fact patterns in which the "substantial impairment" element was based upon a physical impairment. In analyzing Appellant's conviction pursuant to R.C. 2907.02(A)(1)(c), we find other cases' discussion of other pertinent factors to be instructive. In *State v. Bender*, 3rd Dist. Union No 14-19-22, 2020-Ohio-722, 2020 WL 995223, Bender was convicted of rape pursuant to R.C. 2907.02(A)(2): "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." The 3rd District court discussed the legal definition of "fear or duress." On appeal, Bender argued there was insufficient evidence to prove that Bender compelled his victim to engage in sexual conduct by force or threat of force. The appellate court noted:

> (" '[T]he key inquiry for determining whether the State presented sufficient evidence on the element of force is whether the "victim's will was overcome by fear or duress." ' "), *State v. Stevens*, 2016-Ohio-446, 58 N.E.3d 584 (3rd Dist.) at 20, quoting *State v. Wine*, 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-2837 [2012 WL 2371396], ¶ 40, quoting *In re Forbess [N.F.]*, 3d Dist. Auglaize No. 2-09-20, 2010-Ohio-2826 [2010 WL 2488064], ¶ 40, citing *State v. Heft*, 3d Dist. Logan No. 8-09-08, 2009-Ohio-5908 [2009 WL 3720562], ¶ 88, citing *State v. Eskridge*, 38 Ohio St.3d 56, 58-59 [526 N.E.2d 304] (1988). "[I]f the defendant created the belief that physical force will be used in the absence of submission, then threat of force can be inferred"—that is, a "threat of force includes both explicit and implicit threats" because "[n]othing in the rape statute requires the threat of force to be direct or express." *State v. Rupp* [7th Dist. Mahoning No. 05 MA 166, 2007-Ohio-1561, 2007 WL 969069], at ¶ 33.

{¶102} *See also State v. Schaim*, 65 Ohio St. 3d 51, 1992-Ohio-31, 600 N.E.2d 661, at paragraph one of the syllabus ("The 'force or threat of force' element 'can be inferred from the circumstances surrounding sexual conduct.' "). "In order for a defendant to overcome his victim's will by fear or duress, the defendant would have had to engage in sufficient behavior toward the victim. This behavior is objective and its effect is viewed in light of the totality of facts and circumstances existing at the time of the alleged rape." *Rupp* at ¶ 41. *See also Stevens* at ¶ 21 (" '[T]he amount of force [necessary to prove forcible rape under R.C. 2907.02(A)(2)] must be examined in light of the circumstances.' "), quoting *State v.*

*Runyons,* 3d Dist. Union No. 14-91-30, 1992 WL 136196, *2 (June 9, 1992). *Bender, supra,* at ¶ 30. In Bender's case, the appellate court found that based on the totality of the circumstances, a rational trier of fact could infer that his victim's state of fear or duress during a prolonged period of torture was such that she was compelled to submit to the sexual conduct to end the torture. *See also State v. Thomas,* 6th Dist. Lucas No. L-17-1266, 2019-Ohio-1916, 2019 WL 2157933, at ¶ 27.

{¶103} In *State v. Salti,* 8th Dist. Cuyahoga No. 106834, 2019-Ohio-149, 2019 WL 262608, the defendant appealed multiple convictions of rape and kidnapping of multiple young female victims he met online or through a third person. Salti's convictions were also brought pursuant to R.C. 2907.02(A)(2). The appellate court observed:

> "The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other." *State v. Eskridge,* 38 Ohio St.3d 56, 58, 526 N.E.2d 304 (1988). "Force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *State v. Fowler,* 27 Ohio App.3d 149, 154, 500 N.E.2d 390 (8th Dist.1985).

*Salti, supra,* at ¶ 92.

{¶104} In Salti's case, the appellate court found that "the constant threat of violence caused [the victims] to "agree" to perform oral sex on a stranger behind a Walgreens store. Then, during the encounter, [the victims] recognized the stranger as Salti, and Salti threatened them by brandishing a firearm and a knife. *Id.* at ¶ 120. The appellate court found, therefore, there was sufficient evidence that Salti engaged in sexual conduct with [the victim] against her will and that he used the threat of force to compel her submission. Therefore, there was sufficient evidence to support the rape convictions.

{¶105} Recognizing that *Bender* and *Salti* were not convicted under the same subsection of the rape statute, we agree with the State's argument that a reasonable person could make the inference that after Heather Camp was shot in the chest after struggling with Appellant, that she was substantially physically impaired so as to be unable to give consent to sex. As discussed above relative to *Foster,* Appellant did in fact know that Heather was physically injured since he set in motion the events that caused her to be shot in the chest at close range. He did observe specific signs of impairment and in his interview told Detective Antinore that "she was not 100%", and at

14

his camper she asked for pain pills. It may be inferred that given her physical injuries and substantial physical impairment, Heather knew she would not be able to resist sex with Appellant. As in *Bender,* it may be inferred that Heather may have feared further physical violence if she did not consent to sex. Appellant admitted hitting her in the forehead and the side as they drove prior to the shooting. Heather needed assistance walking into the camper. Given her physical injuries, it is reasonable to infer that Heather knew resistance was or would have been futile.

{¶106} The *Salti* court discussed that force may be subtle and psychological, and that the size and strength of the parties is relevant. The *Salti* court concluded that the "constant threat" to the victims caused them to "agree" to sex. Heather Camp had been hit and shot in the chest at close range. Mandy Knisley described Heather's stature as "tiny." It may be hard to imagine what more could have happened to her, but it is reasonable to infer that Heather, in her substantially impaired physical state, may have agreed to consensual sex to avoid further violence.

{¶107} For the foregoing reasons we find no merit to Appellant's argument that there was insufficient evidence that Heather Camp was substantially impaired so as to be unable to give consent to sex. We find any rational trier of fact could have found the evidence of substantial impairment beyond a reasonable doubt. Accordingly, we hereby overrule the second assignment of error.

*Carver*, *supra*, ¶¶ 76-107.

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86 (2011); *Cunningham v. Shoop,* 23 F.4th 636, 650 (6th Cir. 2022); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000), *Hendrix v. Palmer*, 893 F.3d 906, 917 (6th Cir. 2018). Deference is also due under 28 U.S.C. § 2254(d)(2) unless the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Clearly, the Twelfth District decided Carver's insufficiency of the evidence claims as to both murder and rape on the merits. Respondent asserts that decision is entitled to deference because it is not an objectively unreasonable application of clearly established Supreme Court precedent, particularly *Jackson*.

In his Traverse Carver argues at length that he did not intend to kill Heather Camp. He admitted, however, that he intentionally pointed the gun at Heather and that he did shoot her. The fact that he did not admit intending to kill her is not dispositive. Given the evidence presented, it was for the jury to decide what his intention was. The question of what evidence to believe and what inferences to draw from the evidence are for the jury. The Twelfth District's decision on the sufficiency of the evidence is not an unreasonable application of *Jackson* and therefore is entitled to deference. Carver's Second Ground for Relief should be dismissed.

**Ground Three:  Ineffective Assistance of Appellate Counsel**

In his Third Ground for Relief, Petitioner alleges he received ineffective assistance of appellate counsel when his appellate attorney did not make a claim of ineffective assistance of trial counsel for his trial attorney's failure to object to the jury instruction on *mens rea* for murder.

The Twelfth District Court of Appeals granted in part Carver's App. R. 26(B) application, allowing him to reopen the appeal to argue he had received ineffective assistance of appellate counsel when his original appellate attorney did not raise a claim that the trial attorney provided ineffective assistance of trial counsel when he failed to object to an allegedly erroneous *mens rea* jury instruction on murder (Entry of 11/8/2021; State Court Record, ECF No. 8, Ex. 40). However, in the reopened appeal, Carver argued only the merits of the underlying jury instructions issue and

not the ineffective assistance of appellate counsel issues. The Twelfth District held "In Carver's reopened appeal, while he has addressed the issue of the erroneous jury instructions in his brief, he has failed to further address the alleged ineffective assistance of appellate counsel claim." (Decision and Entry of 8/7/2023, State Court Record, ECF No. 8, Ex. 44, ¶ 3). This failure was found to be fatal to the reopened appeal and prevented the appellate court from reaching the merits of the ineffective assistance of appellate counsel claim. *Id.* at ¶ 5.

Respondent argues that merits review of the Third Ground for Relief is barred by Carver's procedural default in presenting it to the Ohio courts (Return, ECF No. 9, PageID 1878).

The procedural default doctrine in habeas corpus is described by the Supreme Court as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional rights claim he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107, 110 (1982). "Absent cause and prejudice, 'a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review.'" *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000), quoting *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle*, 456 U.S. at 110; *Wainwright*, 433 U.S. at 87.

> [A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule. E.g., *Beard v. Kindler*, 558 U.S. 53, 55, 130 S.Ct. 612, 175 L.Ed.2d 417 (2009). This is an important "corollary" to the exhaustion requirement. *Dretke v. Haley*, 541 U.S. 386, 392, 124 S.Ct. 1847, 158 L.Ed. d 659 (2004). "Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address" the merits of "those claims in the first instance." *Coleman* [*v. Thompson*], 501 U.S. [722,] 731-732, 111 S.Ct. 2546, 115 L.Ed.2d 640 [(1991)]. The procedural default doctrine thus advances the same comity, finality, and federalism interests advanced by the exhaustion doctrine. See *McCleskey v. Zant*, 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).

*Davila v. Davis*, 582 U.S. 521, 527 (2017). "[A] federal court may not review federal claims that were procedurally defaulted in state courts." *Theriot v. Vashaw*, 982 F.3d 999 (6th Cir. 2020), citing *Maslonka v. Hoffner*, 900 F.3d 269, 276 (6th Cir. 2018) (alteration in original) (quoting *Davila v. Davis*, 582 U.S. 521, 527(2017)).

Carver seeks to excuse this procedural default by blaming it on ineffective assistance of the attorney appointed to represent him in the reopened appeal (Traverse, ECF No. 17, PageID 1960). He also points out that Ohio law limits him to one application for reopening under Ohio R. App. P. 26(B), so he has no state court remedy for this asserted ineffective assistance. Therefore this Court must decide whether the asserted ineffective assistance of appointed appellate counsel excuses Carver's failure to present the issue to the Twelfth District.

The governing standard for ineffective assistance of counsel claims is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the

> Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.  In other words, to establish ineffective assistance, a defendant must show both deficient performance and prejudice.  *Berghuis v. Thompkins,* 560 U.S. 370, 389 (2010), *citing Knowles v. Mirzayance,* 556 U.S.111 (2009).  To prevail on an ineffective-assistance-of-counsel claim, a movant must establish that (1) counsel's performance was deficient and (2) the deficiency resulted in prejudice, meaning that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Shimel v. Warren*, 838 F.3d 685, 696 (6th Cir. 2016).

> With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

>> Judicial scrutiny of counsel's performance must be highly deferential. . . .  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance;  that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

> As to the second prong, the Supreme Court held:

>> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694.  *See also Darden v. Wainwright*, 477 U.S. 168, 184 (1986), *citing Strickland,*

*supra.*; *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998), *citing Strickland, supra*; *Blackburn v. Foltz*, 828 F.2d 1177, 1180 (6th Cir. 1987), *quoting Strickland,* 466 U.S. at 687. "The likelihood of a different result must be substantial, not just conceivable."  *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011), *quoting Harrington v. Richter*, 562 U.S. 86, 111-12 (2011).

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. See *Wong v. Belmontes*, 558 U.S. 15, 27, 130 S. Ct. 383, 175 L. Ed. 2d 328 (2009) (per curiam); *Strickland,*  466 U.S., at 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. Id., at 696, 104 S. Ct. 2052, 80 L. Ed. 2d 674. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." *Id*., at 693, 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674. The likelihood of a different result must be substantial, not just conceivable. *Id*., at 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

*Harrington v. Richter*, 562 U.S. 86, 111-112 (2011).

Carver's argument is undercut by the Twelfth District's decision in the alternative that the ineffective assistance of appellate counsel claim was without merit.  In confirming the original appellate decision because the colorable claim on which reopening had been granted was not argued in the re-opened appeal, the Twelfth District also held: "Even if we were to consider Carver's sole assignment of error, we would find it to be wholly without merit."  The court then explained at length (¶¶ 30-47) why the omitted claim would not have prevailed (Decision and Judgment Entry of 8/7/2023, State Court Record, ECF No. 8, Ex. 44).

As with other decisions on the merits of constitutional issues later presented in habeas, this Court is bound to defer to a state court decision that is not an objectively unreasonable application

of Supreme Court precedent. In this case the Twelfth District explained at length why there would have been no merit to the omitted ineffective assistance of appellate counsel claim. The Magistrate Judge finds that explanation persuasive, given its length and the fact that it was carefully made by the court which would have had to decide the issue on the merits if it has been properly presented. Carver's procedural default in presenting his ineffective assistance of appellate counsel claim to the Twelfth District is not excused by the ineffective assistance of counsel on the reopened appeal. Therefore Ground Three should be dismissed as procedurally defaulted.

**Ground Four: Ineffective Assistance of Trial Counsel**

In his Fourth Ground for Relief, Carver claims he received ineffective assistance of trial counsel when the trial attorney failed to object to the incorrect recitation of the *mens rea* for murder by the trial judge.

Because that omission was of record at the time of direct appeal, Carver procedurally defaulted the claim when it was not raised on direct appeal. Any attempt to raise it later in a petition for post-conviction relief would have been barred by *res judicata*, which is an adequate and independent state ground of decision. *State v. Perry,* 10 Ohio St. 2d 175 (1967). The failure cannot be excused by ineffective assistance of appellate counsel for the reasons discussed under Ground Three above.

Carver criticizes the Return of Writ for raising only the procedural default defense to both this and Ground Three. He also asserts

> [W]here the enforcement of the violation of a state procedural rule has resulted in the denial of fundamental fairness, thereby violating due process, federal habeas corpus relief will be granted. *Henry v. Trim*, 2013 U.S. Dist. LEXIS 185325 (N.D. Ohio), citing *Cooper v.*

> *Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). The failure of the Court
> to address the issues in these two grounds would result in a denial
> of fundamental fairness.

Traverse, ECF No. 17, PageID 1998. *Cooper v. Sowders* did not discuss a "fundamental fairness"

exception to the procedural default rule but instead upheld a direct claim that the unfairness of the

trial had violated due process. In *Henry*, my colleague Magistrate Judge Kathleen Burke

recommended that the petition for writ of habeas corpus be denied. She expressly upheld the

State's procedural default defense and noted that the so-called "fundamental miscarriage of

justice" exception depended on presentation of new evidence of actual innocence which Petitioner

there had not done. Carver likewise has presented no new evidence of actual innocence to excuse

his procedural default of his ineffective assistance of trial counsel claim. Accordingly, the

Magistrate Judge recommends Ground Four be denied as procedurally defaulted.


**Conclusion**


Based on the foregoing analysis, the Magistrate Judge respectfully recommends the

Petition herein be dismissed with prejudice. Because reasonable jurists would not disagree with

this conclusion, it is also recommended that Petitioner be denied a certificate of appealability and

that the Court certify to the Sixth Circuit that any appeal would be objectively frivolous and should

not be permitted to proceed *in forma pauperis*.


May 5, 2025.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Because this document is being served by mail, three days are added under Fed.R.Civ.P. 6, but service is complete when the document is mailed, not when it is received. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal.